1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ISRAEL RADILLO SANCHEZ,              No.  2:12-cv-2869-TLN-EFB P

12              Petitioner,

13        vs.                            FINDINGS AND RECOMMENDATIONS

14   MARION SPEARMAN,

15              Respondent.[1]

16

17         Petitioner Israel Sanchez is a state prisoner proceeding pro se with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

19   entered against him on June 4, 2008 in the Yolo County Superior Court on charges of two counts

20   of forcible rape, two counts of rape in concert, and one count each of kidnapping, assault, false

21   imprisonment, and sexual battery, with a finding that the rape and rape in concert offenses were

22   committed under circumstances involving a kidnapping and movement of the victim which

23   substantially increased her risk of harm.  Petitioner seeks federal habeas relief on the following

24   grounds: (1) the evidence introduced at his trial is insufficient to support his conviction on the

25   _____

        [1]    Previously named as respondent was People of the State of California.  The court now
26   substitutes in the correct respondent, the Warden of the Correctional Training Facility (CTF),
     where petitioner is presently incarcerated.  "A petitioner for habeas corpus relief must name the
27   state officer having custody of him or her as the respondent to the petition."  *Stanley v. California
     Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254).  *See
28   also Smith v. Idaho*, 392 F.3d 350, 355-56 (9th Cir. 2004)).

                                        1

kidnapping charge; (2) his constitutional rights were violated by the prosecutor's improper use of peremptory challenges to exclude five Hispanics from the jury; (3) the denial of his motion for a separate trial and the admission into evidence at a joint trial of his and his co-defendant's statements to police violated his federal constitutional rights; (4) the trial court violated his right to due process in giving a jury instruction on rape and rape in concert which was tantamount to a directed verdict; (5) his trial counsel rendered ineffective assistance; and (6) the cumulative effect of errors at his trial violated his right to due process.  Upon careful consideration of the record and the applicable law and for the reasons stated below, it is recommended that petitioner's application for habeas corpus relief be denied.

**I. Background**

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Defendants, Alberto Sanchez (Alberto), Israel Sanchez (Israel) and Edgar Radillo (Edgar), picked up a young woman and drove her to a remote location in Yolo County where they sexually assaulted her.  All three were convicted by a jury of two counts each of forcible rape (Pen.Code, § 261, subd. (a)(2)) and rape in concert (*id.* § 264.1) and one count each of assault ( *id.* § 245, subd. (a)(1)), false imprisonment (*id.* §§ 236 and 237, subd. (a)) and sexual battery (*id.* § 243.4, subd. (a)).   (Further undesignated section references are to the Penal Code.)   In addition, Alberto and Israel were convicted of kidnapping (§ 207, subd. (a)), while Edgar was found guilty of the lesser included offense of false imprisonment.  Finally, the jury found as to Alberto and Israel that the rape and rape in concert offenses had been committed under circumstances involving a kidnapping and movement of the victim which substantially increased her risk of harm (§ 667.61).
>
> Alberto and Israel were sentenced to an aggregate determinate term of five years plus a consecutive indeterminate term of 25 years to life.  Edgar received an aggregate determinate term of 23 years, 8 months.
>
> * * *
>
> The People correctly concede Alberto's two rape convictions (counts 2 and 4) and the false imprisonment convictions (count 7) of Israel and Alberto must be vacated.  We thus accept those concessions.  We also conclude Edgar's conviction for the lesser

/////

2

included offense of false imprisonment on count 1 must be dismissed in light of his conviction for the same offense on count 7. In all other respects, we affirm the judgments.

**Facts and Proceedings**

On the evening of August 11, 2006, 16–year–old Antonio S. met Edgar and Alberto at a school in Dixon and the three smoked marijuana. Later, Israel joined them and the four departed in Israel's 4–door Acura. They drove around Dixon for a while and then headed for Davis. Antonio and Edgar continued to smoke marijuana in the back seat of the car. At some point during their drive around Davis, they stopped for gas and Antonio purchased a bag of Doritos. They then continued their cruise past the local bars.

That same evening, 23–year–old S.L. and some friends went out for a night of dinner and drinking in downtown Davis. At approximately 11:00 p.m., S.L. left her friends and went to another bar to meet someone. She left that bar at around 1:00 or 1:30 a.m. She was intoxicated, tired and wanted to go home. However, her ride for the evening had already gone home.

S.L. started walking down the street and thinking how she might get home. Just then, Israel and the others drove by. They stopped and asked if S.L. was alright and if she needed help. S.L. said she wanted to go home and they offered to take her there. S.L. accepted the offer and told them she lived off Covell and Alvarado in Davis. She got in the back of the car between Antonio and Edgar and instructed them to take Highway 113 and exit at Covell. She repeated that she just wanted to go home. They agreed to take her home.

A couple of minutes after S.L. got into the car, the men began passing around a marijuana cigar to smoke. They offered it to S.L. and she took a puff. Israel proceeded onto Highway 113 but did not take the Covell exit. As they drove, Antonio began touching S.L.'s leg and she told him to stop and pushed his hand away. She repeated that she just wanted to go home.

As they drove away from Davis, S.L. asked where they were going, but nobody responded. They eventually arrived at a remote area and drove up a dirt driveway. Israel turned off the car and the car lights.

What happened thereafter is less certain. Both S.L. and Antonio testified at trial and described different versions. According to S.L., the four men got out of the car and ordered her out. She refused, and one of them yelled at her to get out. She got out of the car and began to cry. S.L. pleaded, "Please don't do this. Please don't. I beg you, please stop. Don't do this to me." One of the men pushed S.L. onto the ground near the car and then someone got on top of her while the others stood around them in a circle. The man on top of S.L. told her to take off her skirt. She refused, and he took it off for her, along with her underpants. S.L. then heard cheering and laughing and "abrela, abrela," which means open. S.L. began

3

moving around trying to get the man off of her and he punched her in the left eye. He then penetrated her vagina with his penis. The man remained on top of S.L. for five to seven minutes and then told her not to tell anyone.

According to S.L., after the first man got off her another took his place. He too penetrated her vagina with his penis. This man pulled down her shirt and bra and squeezed her left breast "very hard." After this man got off S.L., the men kicked her in the stomach and neck. She laid there until she heard the car engine start and heard them drive away.

Antonio testified pursuant to a plea deal whereby he was permitted to plead guilty to two felonies with no particular promise as to sentencing. According to Antonio, after they arrived at the remote location, S.L. said she was going to be sick and she and Edgar got out of the car. Israel and Alberto also got out, but Antonio remained in the car. Edgar held S.L. while she vomited. Israel eventually walked over to them and took over holding S.L. Meanwhile, Alberto took S.L.'s purse out of the car and emptied it on the trunk. He found condoms inside.

According to Antonio, Alberto and Edgar eventually joined Israel and together they removed S.L.'s clothes. Israel and Alberto then walked S.L. over to a grassy area and laid her down. Alberto threw Israel a condom taken from S.L.'s purse. Israel got on top of S.L. and had sexual intercourse with her. According to Antonio, S.L. did not appear to be a willing participant. He heard her moaning and yelling "no" and "stop." After Israel finished, he asked, "Who is next?" Alberto gave Edgar another condom from S.L.'s purse and Edgar got on top of S.L. and had sexual intercourse with her.

At some point during the foregoing, Antonio got out of the car and smoked a cigarette. He also discarded the empty Doritos bag he had obtained at the gas station. By the time Edgar finished with S.L., Antonio was back in the car. After Edgar rejoined the others at the car, they got in and started to drive away. However, at the end of the driveway, Alberto told Israel to stop the car. Alberto got out and was gone four to five minutes. When he returned, he told them he had beaten S.L. up. On the way home, the others instructed Antonio not to say anything about what happened.

After the men left, S.L. blacked out for a short period. When she awoke, her stomach hurt and she was cold. She got up and started running from the area for fear that the men might return. In the distance, she saw the lights of a city and moved in that direction. She was wearing only her top and shoes. S.L. was eventually discovered by police officers at 4:45 a.m. walking along County Road 102. She appeared injured, stated that she had been raped and pointed in the direction of where it had occurred. She informed the officers that the rest of her clothes and her purse were still at the scene.

/////

4

Officers eventually located the crime scene and found S.L.'s clothes and purse.  They also found an empty Doritos bag, a condom wrapper, two condoms, and a receipt from one of the bars where S.L. had been that evening.  They located an area where the grass appeared to be pressed down as if someone had been lying on it.

A fingerprint lifted from the Doritos bag was determined to be a match to one on file for Antonio.  On August 25, officers served a search warrant at Antonio's home.  They picked up Antonio and took him in for questioning.  Antonio admitted picking up S.L. that evening and indicated three others had been involved.  He identified one of the participants as Alberto Sanchez but provided only first names, Edgar and Israel, for the other two.

Officers later picked up Alberto, Edgar and Israel and brought them in for questioning.  DNA from one of the condoms found at the scene was later determined to be a match for Edgar, and DNA from the other condom was found to be a match for Israel.

Alberto testified at trial.  He admitted picking up S.L. in the early morning hours of August 12, 2006, and taking her to a remote location.  According to Alberto, after they arrived at the scene, he walked over to a gate at the entrance to the driveway and remained there until they departed 15 minutes later.  He claimed not to have heard or seen anything that was done by the others with S.L.

As noted previously, Antonio was given a plea deal and testified for the prosecution.  The other three were charged with kidnapping (count 1), two counts of rape (counts 2 and 4), two counts of rape in concert (counts 3 and 5), assault (count 6), false imprisonment (count 7), and sexual battery (count 8).  They were also charged with enhancements on the rape and rape in concert charges for having kidnapped the victim and having moved her so as to substantially increase her risk of harm.

Israel and Alberto were convicted as charged.  Edgar was found guilty on all charges except kidnapping, for which he was instead convicted of the lesser included offense of false imprisonment.  The jury also found not true as to Edgar all of the enhancements on the rape and rape in concert charges.

Alberto was sentenced on the assault charge (count 6) to the upper term of four years and on the sexual battery charge (count 8) to a consecutive one-third the middle term of one year, for an aggregate determinate sentence of five years.  In addition, Alberto received a consecutive indeterminate term of 25 years to life for one rape in concert charge (count 3) and an identical term to run concurrently on the other rape in concert charge (count 5).  Sentence on the remaining counts was stayed pursuant to section 654.  Alberto received credit for time served of 356 days plus 53 days of conduct credits, for a total of 409 days.

Israel received the same sentence as Alberto, except instead of staying sentence on the rape charges (counts 2 and 4), the court

struck those charges.  Israel received credit for time served of 346
days plus 51 days conduct credits, for a total of 397 days.

*People v. Sanchez*, No. C059763, 2011 WL 3806264, at **1-4 (Cal.App. 3 Dist. Aug. 30, 2011).

After the California Court of Appeal affirmed petitioner's judgment of conviction, he filed a petition for review in the California Supreme Court.  Resp't's Lodg. Doc. 11.  Therein, he raised all of the claims that he raises in the petition before this court, with the exception of his claim of ineffective assistance of trial counsel.  The petition for review was summarily denied. Resp't's Lodg. Doc. 14.

Petitioner then filed a petition for writ of habeas corpus in the California Supreme Court. Resp't's Lodg. Doc. 41.  He claimed in that petition that:  (1) the evidence introduced at his trial is insufficient to support his conviction on the kidnapping charge; (2) his constitutional rights were violated by the prosecutor's improper use of peremptory challenges to exclude five Hispanics from the jury; (3) his trial counsel rendered ineffective assistance; (4) the trial court violated his right to due process in giving a jury instruction on rape and rape in concert which was tantamount to a directed verdict against him; and (5) the cumulative effect of errors at his trial violated his right to due process.  *Id*.  The California Supreme Court denied that petition with citations to *In re Waltreus*, 62 Cal.2d 218, 225 (1965) ("habeas corpus ordinarily cannot serve as a second appeal), *People v. Duvall*, 9 Cal.4th 464, 474 (1995) (conclusory allegations made without an explanation of the basis for the allegations or reasonably available documentary evidence do not warrant habeas relief), and *In re Lindley*, 29 Cal.2d 709, 723 (1947) (a claim of insufficiency of the evidence can only be considered on direct appeal).  Resp't's Lodg. Doc. 42.

On May 23, 2013, petitioner filed a first amended petition for a writ of habeas corpus in this court, upon which this action proceeds.  ECF No. 23.

**II.  Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

1  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.

2  2000).

3         Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

4  corpus relief:

5                 An application for a writ of habeas corpus on behalf of a
          person in custody pursuant to the judgment of a State court shall not
6          be granted with respect to any claim that was adjudicated on the
          merits in State court proceedings unless the adjudication of the
7          claim -

8                 (1) resulted in a decision that was contrary to, or involved
          an unreasonable application of, clearly established Federal law, as
9          determined by the Supreme Court of the United States; or

10                (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
11         State court proceeding.

12  For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

13  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

14  *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

15  ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.*

16  *Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

17  what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*,

18  633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

19  precedent may not be "used to refine or sharpen a general principle of Supreme Court

20  jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  *Marshall*

21  *v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155

22  (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so

23  widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

24  be accepted as correct.  *Id.*  Further, where courts of appeals have diverged in their treatment of

25  an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

26  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

27         A state court decision is "contrary to" clearly established federal law if it applies a rule

28  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

1  precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003).

2  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

3  writ if the state court identifies the correct governing legal principle from the Supreme Court's

4  decisions, but unreasonably applies that principle to the facts of the prisoner's case. [2] *Lockyer v.*

5  *Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002

6  (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

7  court concludes in its independent judgment that the relevant state-court decision applied clearly

8  established federal law erroneously or incorrectly.  Rather, that application must also be

9  unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473

10  (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

11  review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

12  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

13  'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v.*

14  *Richter*, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S.

15  652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

16  court, a state prisoner must show that the state court's ruling on the claim being presented in

17  federal court was so lacking in justification that there was an error well understood and

18  comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131

19  S. Ct. at 786-87.

20       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

21  court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

22  527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

23  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

24  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

25  considering de novo the constitutional issues raised.").

26  ———————————

27       [2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,

28  384 F.3d 628, 638 (9th Cir. 2004)).

1    The court looks to the last reasoned state court decision as the basis for the state court

2    judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If

3    the last reasoned state court decision adopts or substantially incorporates the reasoning from a

4    previous state court decision, this court may consider both decisions to ascertain the reasoning of

5    the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

6    a federal claim has been presented to a state court and the state court has denied relief, it may be

7    presumed that the state court adjudicated the claim on the merits in the absence of any indication

8    or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85.  This

9    presumption may be overcome by a showing "there is reason to think some other explanation for

10   the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

11   803 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

12   but does not expressly address a federal claim, a federal habeas court must presume, subject to

13   rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___,

14   ___, 133 S.Ct. 1088, 1091 (2013).

15       Where the state court reaches a decision on the merits but provides no reasoning to

16   support its conclusion, a federal habeas court independently reviews the record to determine

17   whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.*

18   *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

19   review of the constitutional issue, but rather, the only method by which we can determine whether

20   a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.  Where no

21   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

22   reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

23       A summary denial is presumed to be a denial on the merits of the petitioner's claims.

24   *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

25   just what the state court did when it issued a summary denial, the federal court must review the

26   state court record to determine whether there was any "reasonable basis for the state court to deny

27   relief." *Richter*, 131 S. Ct. at 784.  This court "must determine what arguments or theories ...

28   could have supported, the state court's decision; and then it must ask whether it is possible

1   fairminded jurists could disagree that those arguments or theories are inconsistent with the

2   holding in a prior decision of [the Supreme] Court."  *Id.* at 786.  The petitioner bears "the burden

3   to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  *Walker v.*

4   *Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 131 S. Ct. at 784).

5        When it is clear, however, that a state court has not reached the merits of a petitioner's

6   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

7   habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

8   F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

9   **III.  Petitioner's Claims**

10        **A.  Insufficient Evidence**

11        Petitioner's first claim for relief is that the evidence introduced at his trial is insufficient to

12   support his conviction on the kidnapping charge because he never "moved" the victim.  ECF No.

13   23 at 7-9.[3]  He claims that the trial testimony was contradictory and inconsistent with respect to

14   whether the victim was actually moved, or just pushed to the ground near the car.  *Id.* at 7.  He

15   contends that the testimony of Antonio Sanchez, who stated that petitioner and Alberto Sanchez

16   moved the victim between two and twenty feet from the car, should be "thrown out" because it

17   was internally inconsistent with respect to how far the victim was moved and contradicted the

18   victim's testimony that after she got out of the car she was simply pushed to the ground.  *Id.*

19   Petitioner also argues that Antonio Sanchez "blatantly lied" on the witness stand in order to

20   obtain a plea agreement and a reduced sentence.  *Id.* at 7-8.

21        Petitioner further argues that there was no evidence the victim was unlawfully moved by

22   the use of physical force or fear because she initially consented to get in the car and asked for a

23   ride home.  *Id.* at 8.  He argues that it is not kidnapping when the victim voluntarily asks for a

24   ride home.  *Id.* at 9.  Petitioner also contends that any movement of the victim was "barely

25   minimal" and that he and his co-defendants did not "keep" the victim, but left her "right where

26   /////

27   _____

28        [3]   Page number citations such as this one are to the page numbers reflected on the court's
    CM/ECF system and not to page numbers assigned by the parties.

she was at." *Id.* at 8-9.  Petitioner requests that this court "consider a 'lesser' included offense of false imprisonment."  *Id.* at 7.

## 1. Decision of the California Court of Appeal

The last reasoned state court decision on petitioner's claim of insufficient evidence is the decision of the California Court of Appeal.  The Court of Appeal denied the claim, reasoning as follows:

> Israel and Alberto were convicted of kidnapping as alleged in count 1.  On counts 2, 3, 4 and 5, they were also found to have committed the rape offenses in the course of a kidnapping and movement of the victim that substantially increased her risk of harm.
>
> In argument to the jury, the prosecutor mentioned there were potentially three kidnappings: (1) "when they passed Covell," (2) "when they went to County Road 26A," and (3) "when Israel carried her to that bush."  The prosecutor further argued the jurors need not agree on which leg of the overall movement constituted the kidnapping.  However, the prosecutor also emphasized that the movement of the victim was a continuous course of conduct and amounted to but one offense.
>
> * * *
>
> In order to prove simple kidnapping under section 207, subdivision (a), the prosecution must establish that "'(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.'"  (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.)
>
> * * *
>
> Israel contends the record does not support the prosecution's argument to the jury that a separate kidnapping occurred when the victim was moved from the car to the grassy area.  He argues there is insufficient evidence this movement was for a substantial distance, as required for simple kidnapping.  Israel points out that S.L. testified the rapes occurred "fairly close" to the car.  He further asserts Antonio's testimony about how far S.L. was moved was all over the place.  Although Antonio indicated S.L. was moved as much as 20 feet, he also testified S.L. was moved only a couple of feet, and ultimately said he did not know how far she was moved.
>
> Israel further contends it cannot be determined from the record which portion of the overall movement the jury used to convict him of kidnapping.  Therefore, because there is insufficient evidence that the final movement at the crime scene amounted to a kidnapping, the conviction must be reversed.

Where a case is presented "'to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand.'" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1122.)  In *People v. Green* (1980) 27 Cal.3d 1 (*Green*), *overruled by People v. Martinez* (1999) 20 Cal.4th 225 (*Martinez*), the defendant was convicted of murder, robbery and kidnapping.  The latter could have been based on any of three distinct segments of asportation. (*Id.* at pp. 62–63.)  The trial court misinstructed the jury on the law as to the first segment and the high court concluded movement of the victim 90 feet in the third segment was insufficient as a matter of law for kidnapping.  Only the second movement supported the conviction.   (*Id.* at pp. 63–65, 67.)   Because it could not be determined from the record which movement the jury relied on to convict the defendant, the kidnapping conviction could not stand. (*Id.* at pp. 71, 74.)

The present matter does not involve multiple discrete acts of kidnapping but one continuous course of conduct that began when defendants drove the victim past her exit and ended when defendants left her behind at the crime scene.  It is unfortunate that the prosecutor chose to break down the asportation into segments for purposes of jury argument.  Apparently the prosecutor was concerned that the jury might conclude S.L. had accompanied defendants to the crime scene voluntarily.  However, whether S.L.'s consent was rescinded when they drove past her exit or when she was carried from the car to the grassy area after pleading to be left alone does not matter.  What matters is that at some point during this continuum of movement, S.L. no longer went along voluntarily.  At that point, the kidnapping commenced.

At any rate, Israel's sufficiency of the evidence argument is premised on an assertion that movement of S.L. at the crime scene, the purported third segment of the movement, was insufficient as a matter of law to satisfy the asportation requirement of simple kidnapping.  As we shall explain, we disagree.

In *Martinez*, the California Supreme Court changed the standard previously established in *People v. Caudillo* (1978) 21 Cal.3d 562 and *People v. Stanworth* (1974) 11 Cal.3d 588 for assessing the asportation requirement for simple kidnapping.  Under prior law, the only relevant factor was the actual distance moved.  (*Caudillo*, at p. 574; *Stanworth*, at p. 603.)  "*Martinez* overruled *Caudillo* to the extent it 'prohibited consideration of factors other than actual distance' (*Martinez, supra*, 20 Cal.4th at p. 237, fn. 6) because 'limiting a trier of fact's consideration to a particular distance is rigid and arbitrary, and ultimately unworkable' (*id.* at p. 236). *Martinez* established a new asportation standard for simple kidnapping – one that took into account 'the "scope and nature" of the movement . . ., and any increased risk of harm' – thereby bringing the standard closer to the one for aggravated kidnapping. (*Ibid.*)  *Martinez* required a jury to 'consider the totality of the circumstances' in deciding whether a victim's movement is substantial.  (*Id.* at p. 237.)  'Thus, in a case where the evidence

permitted, the jury might properly consider not only the actual distance the victim moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.' (*Ibid.* . . . )" (*People v. Bell, supra*, 179 Cal.App.4th at p. 436, italics omitted.)

Martinez made clear that for simple kidnapping the asportation must be "'substantial in character,'" which may include consideration of more than just the distance moved. (*Martinez, supra*, 20 Cal.4th at p. 235.)

The jury here was instructed in accordance with the revised standard of *Martinez*. The prosecutor further argued the jury may consider such factors as whether the movement increased the risk of harm or decreased the likelihood of detection in deciding whether movement of the victim was substantial.

The victim was moved at the crime scene no more than 20 feet. However, it is the character of that movement that satisfies the requirements for simple kidnapping. During the testimony of Antonio S., the prosecution played a DVD depicting the approach to the crime scene on a county road and entry up the gravel driveway where the sexual assault occurred. That DVD shows clearly that any car parked along the driveway would have been visible from the county road. However, because of trees, bushes and underbrush in the area, movement of the victim from the vicinity of the car to a grassy area 20 feet away would have made it impossible for anyone passing by on the road to see the assault taking place. In other words, the movement decreased the likelihood of detection.

In *People v. Dominguez* (2006) 39 Cal.4th 1141 (*Dominguez*), the defendant moved the victim from the side of a road down an embankment to a spot 25 feet away and 10 to 12 feet below the road surface. This was a location "where it was unlikely any passing driver would see her" and where trees would have tended to obscure the crime scene. (*Id.* at p. 1153.) According to the court: "The movement thus changed the victim's environment from a relatively open area alongside the road to a place significantly more secluded, substantially decreasing the possibility of detection, escape or rescue." (*Ibid.*) The high court concluded this movement was sufficient to support the defendant's kidnapping conviction. (*Id.* at p. 1155.)

Although *Dominguez* involved a prosecution for aggravated kidnapping, which requires a finding that the movement increased the risk of harm to the victim (*Dominguez, supra*, 39 Cal.4th at p. 1150), *Martinez* brought the standard for simple kidnapping closer to that of aggravated kidnapping (*People v. Bell, supra*, 179 Cal.App.4th at p. 436). Essentially, both types of kidnapping are

assessed in terms of whether the movement increased the risk of harm to the victim, but only aggravated kidnapping requires such a finding.

In the present matter, we conclude movement of the victim from the car to the secluded area 20 feet away, thereby making it less likely the sexual assault would be detected and more likely further crimes could be committed on the victim, was sufficient to support the kidnapping convictions of Israel and Alberto.

*Sanchez*, 2011 WL 3806264, at ** 20-23.

### 2. Applicable Legal Standards

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, ___ U.S. ___, 132 S.Ct. 2, *4 (2011). Sufficiency of the evidence claims in federal habeas proceedings must be measured with reference to substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16.

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." *Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*,___ U.S. ___, 132 S.Ct. 2060, 2064 (2012) ( per curiam ) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

1    "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

2    the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

3    *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  Because this case is governed by the

4    AEDPA, this court owes a "double dose of deference" to the decision of the state court.  *Long v.*

5    *Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (quoting *Boyer v. Belleque*, 659 F.3d 957, 960 (9th

6    Cir. 2011), *cert. denied* ___ U.S. ___, 132 S.Ct. 2723 (2012)).

7              **3. <u>Analysis</u>**

8         As set forth above, petitioner was convicted of kidnapping, in violation of Cal. Penal Code

9    § 207(a).  Section 207(a) provides as follows:

10              Every person who forcibly, or by any other means of instilling fear,
                steals or takes, or holds, detains, or arrests any person in this state,
11              and carries the person into another country, state, or county, or into
                another part of the same county, is guilty of kidnapping.
12

13        As explained by the California Court of Appeal, in order to prove a violation of this

14   statute, the prosecution must establish that: "(1) a person was unlawfully moved by the use of

15   physical force or fear; (2) the movement was without the person's consent; and (3) the movement

16   of the person was for a substantial distance."  *Sanchez*, 2011 WL 3806264, at *20.

17        After a careful analysis of state law and the facts of this case, the California Court of

18   Appeal concluded that the kidnapping in this case occurred when the victim no longer consented

19   to remain with petitioner and his co-defendants.  This conclusion is amply supported by the state

20   court record.  There was considerable evidence introduced at petitioner's trial that, while S.R.

21   initially asked petitioner and his co-defendants to take her home, she did not consent to being

22   taken into the country, moved away from the car, having her clothes removed, or pushed to the

23   ground.

24        The California Court of Appeal also concluded that S.L. was moved for a substantial

25   distance against her will after her participation was no longer voluntary, even if the kidnapping is

26   considered to have happened at the scene of the rape.  This conclusion is supported by the

27   testimony of Antonio Sanchez, who stated on direct examination that petitioner and Alberto

28   walked the victim a "couple of feet" away from the car to a grassy area near a tree, where they

15

1    laid her down on the ground.  Reporter's Transcript on Appeal (RT) at 303, 307, 308, 392.

2    Although Antonio testified on cross-examination that the distance was "about 15 feet" and also

3    that he didn't remember exactly how many feet she was moved, *id.* at 456, he never wavered in

4    his testimony that the victim was moved some feet away from the car to a grassy area.  A rational

5    jury could have concluded from Antonio's statements that the victim was moved away from the

6    car to a location that "decreased the likelihood of detection." *Sanchez*, 2011 WL 3806264, at *22.

7    As explained by the California Court of Appeal, this is sufficient to satisfy the asportation

8    requirement of the kidnapping statute under California law.

9        The state court's rejection of petitioner's claim of insufficient evidence is not clearly

10   erroneous and does not constitute an unreasonable application of *Winship* to the facts of this case.

11   Certainly, the Court of Appeal's decision is not "so lacking in justification that there was an error

12   well understood and comprehended in existing law beyond any possibility for fairminded

13   disagreement." *Richter*,131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to federal

14   habeas relief on this claim.

15       **B.  Improper Use of Peremptory Challenges**

16           **1.  <u>Background</u>**

17       Petitioner claims in his next ground for relief that his constitutional rights were violated

18   by the prosecutor's improper use of peremptory challenges to exclude five Hispanics from the

19   jury.  ECF No. 23 at 10-22.  In a lengthy and thorough opinion, the California Court of Appeal

20   described the background to this claim and its ruling thereon.  With citation to *People v. Wheeler*

21   (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*), it

22   accurately recited the governing law.  It noted that after the prosecution exercised its first five

23   peremptory challenges on jurors who self-identified as Hispanic, defendants (each of whom is

24   Hispanic) raised a *Wheeler/Batson* challenge and that the prosecution responded with various

25   nondiscriminatory reasons for the peremptory challenges, and the trial court rejected the

26   challenge without prejudice to renewal at a later time.  The state appellate court observed that

27   "[i]t is well settled that '[a] prosecutor's use of peremptory challenges to strike prospective jurors

28   on the basis of group bias – that is, bias against 'members of an identifiable group distinguished

16

on racial, religious, ethnic, or similar grounds' . . . violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." *Sanchez*, 2011 WL 3806264, at *5.  In applying *Batson* to this record, the state appellate court explained its reasoning as follows:

> A *Wheeler/Batson* challenge involves a three-step process. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.  Third, the court determines whether the defendant has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.  [Citation.]"  (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613.)

> Where, as here, the trial court makes no specific finding on whether the defendant made the required prima facie showing and the prosecutor explains the basis for her challenge, we proceed to the second and third steps of the process.  (*People v. Cowan* (2010) 50 Cal.4th 401, 448.)

> "A prosecutor asked to explain his conduct must provide a '"clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.'  [Citation.]  'The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.'  [Citation .]  A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.  [Citations.]  Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection.  [Citation.]  Certainly a challenge based on racial prejudice would not be supported by a legitimate reason."  (*People v. Lenix, supra*, 44 Cal.4th at p. 613.)

> On direct review, the *Batson/Wheeler* issue "turns largely on an 'evaluation of credibility.'  [Citation.]  The trial court's determination is entitled to 'great deference,' [citation], and 'must be sustained unless it is clearly erroneous,' [citation]."  (*Felkner v. Jackson* (2011) 562 U.S. —— .)

> "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'  [Citation.]  In assessing credibility, the court draws upon its contemporaneous observations of the voir dire.  It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her.  [Citation.]"  (*People v. Lenix, supra*, 44 Cal.4th at p. 613, fn. omitted.)

"The proper focus of a *Batson/Wheeler* inquiry is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons. [Citation.]   What matters is that the prosecutor's reason for exercising the peremptory challenge is legitimate.  A '"legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection.   [Citations.]'   [Citation.]"   (*People v. Hamilton, supra*, 45 Cal.4th at p. 903.)

**Prospective Juror Danielle A.**

The prosecutor exercised her first peremptory challenge on Danielle A.   During the *Wheeler/Batson* hearing, the prosecutor explained she did not feel comfortable having Danielle on the jury because "she herself and her husband have been accused and arrested for drug offenses."   In her questionnaire, Danielle had answered "yes" to the question: "Have you, a close friend, or relative ever been ACCUSED or ARRESTED for a crime, even if the case did not come to court?"   Danielle further indicated the individuals involved had been herself, her husband and her son and that there had been no trial.   Danielle identified the crimes as "drug possession various traffic ect. [sic]."   In response to the question "What happened?" Danielle indicated: "probation, jail time, fines ect [sic]."   Finally, in response to the question, "How do you feel about what happened?" Danielle answered: "Things happened the way they should have[.] [Y]ou do something then you deserve the consequences of your actions."

During voir dire, the court questioned Danielle A. about the prior offenses as follows:

"Q. Now, you make reference in one of the questions to the situation involving yourself, your husband and your son.  Were any charges ever filed in that respect?

"A. Traffic, a few, but—

"Q. No felonies or misdemeanors?

"A. Yes, there were."

At the *Wheeler/Batson* hearing, the trial judge acknowledged that perhaps he should have been more assertive in questioning her about the prior offenses but he "didn't want to embarrass her."

Defendants contend the prosecution had insufficient information about the prior offenses to use them as a basis for excusing the potential juror.   They point out there was no information about the age of the offenses, where they occurred, whether there was a conviction, or whether they involved misdemeanors or felonies. They argue it is uncertain whether Danielle A., her husband or her son had been the one involved in the drug offense.   Defendants further argue the prosecutor failed to question the juror about the offenses, thereby demonstrating this was not the motivating factor for her challenge.

The People acknowledge that the exact nature of the charges against Danielle A. and/or her husband and son is not revealed by the record but argue the prosecutor need not question a potential juror if the prosecutor already has enough information to make a decision on whether to allow the person to remain on the jury.

The People have the better argument.  "A prospective juror's negative experience with the criminal justice system, including arrest, is a legitimate, race-neutral reason for excusing the juror." (*People v. Cowan, supra*, 50 Cal.4th at p. 450.)   This is true whether it is the juror herself or a family member who was involved. (*See ibid.*)  And while the age of the offense and whether it was a misdemeanor or a felony may be relevant considerations, they are not determinative.  Hence, while a failure to engage in meaningful voir dire can in some important circumstances, be circumstantial evidence suggesting pretext (*People v. Lomax* (2010) 49 Cal.4th 530, 573), we agree with the People it was not necessary in this instance for the prosecution to ascertain the details of the prior offenses of Danielle A. or her family in order to use this as a legitimate basis for a peremptory challenge.

Defendants argue the pretextual nature of the prosecutor's stated rationale is revealed in her failure to challenge two similarly situated non-Hispanic jurors, Jurors No. 1 and 11.  "'If a prosecutor's proffered reason for striking a [Hispanic] panelist applies just as well to an otherwise-similar [non-Hispanic] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered'" in the third step of the *Wheeler/Batson* analysis.  (*People v. Lomax, supra*, 49 Cal.4th at pp. 571–572.)   In this instance, Juror No. 1's father had been accused of sexual misconduct, and Juror No. 11 had received a speeding ticket "for no reason."

The People counter that Jurors No. 1 and 11 were not similarly situated to Danielle A., because elsewhere in their questionnaires they demonstrated a pro-prosecution or pro-victim bias.  Juror No. 11 stated the following about the crimes charged in the instant case: "Rape is a very serious and terrible crime that should be punished fully."  He also indicated a friend had previously been raped, but no charges had been filed and expressed a belief that rape is an underreported crime because of fear.  Juror No. 1 disclosed that he had been a victim of sexual assault throughout his childhood, but no charges had ever been filed.

Again, we agree with the People.  While Juror No. 1's father may have been accused of sexual misconduct, it also appears Juror No. 1 may have been the victim.  Thus, he can hardly be considered one who believes his family may have been unjustly accused.  And while Juror No. 11 did indicate he had been unjustly accused of speeding, he also demonstrated affinity to victims of the crimes charged in this matter.  Thus, he too was not necessarily one who would have a bias against law enforcement.

The record supports a race-neutral basis for the prosecutor's challenge of Danielle A.

19

**Prospective Juror Carlos H.**

The prosecutor exercised her second peremptory challenge on potential Juror Carlos H.  The prosecutor based this challenge on the following factors: (1) as a teenager, Carlos had been kicked off of a ladder by a border patrol officer who was chasing illegal aliens; (2) Carlos had a bad experience with law enforcement in the resolution of a case where his grandson was the victim; (3) Carlos's uncle had been accused of and arrested for drug addiction; (4) Carlos believes some additional evidence is needed to support the testimony of a witness; and (5) Carlos's brother was accused of sexual assault.  Each of these factors is supported by Carlos's questionnaire responses.

Defendants argue the incident with the ladder, which occurred 42 years earlier, cannot serve as a valid basis for challenging the potential juror and the factor involving the grandson as a victim actually cuts against the defense, not the prosecution.  They further argue the prosecutor's failure to question Carlos H. about any of these factors reveals their pretextual nature.  Finally, defendants argue the prosecutor failed to challenge similarly situated jurors who had had negative experiences with law enforcement or expressed a belief that additional evidence is necessary to corroborate the testimony of a witness.

Given the many factors cited by the prosecutor, she cannot be faulted for failing to question the potential juror.  There was certainly enough from the questionnaire alone to support the challenge.  As for the age of the ladder incident, this merely goes to the weight of the factor.  And while the fact the potential juror's grandson was the victim of an unsolved robbery may have biased him against criminal defendants in general, the prosecutor was free to surmise this would also bias him against law enforcement who failed to solve the crime.  Finally, as to similarly-situated jurors, defendants point to none who have the same or similar combination of factors as Carlos H.  Thus, there were no similarly-situated jurors.

The record supports the prosecutor's peremptory challenge of Carlos H.

**Prospective Juror Sarah H.**

The prosecution's next challenge was to Sarah H. The prosecutor cited two factors supporting that challenge: (1) Sarah had had a negative experience with law enforcement; and (2) she had once been arrested for assault and had been required to convince the judge of her innocence.

In her questionnaire, Sarah H. answered "yes" to the question whether she ever had a particularly bad experience with law enforcement officials.  She explained: "A police officer, without his lights on, ran a red light in Davis and almost hit me while I was in the intersection.  He then tried to pull me over and give me a speeding ticket when I was not speeding.  He let me go after seeing

I was not alone in my vehicle and I demanded his badge number." Elsewhere in the questionnaire, Sarah indicated that, in 2004, she had been accused or arrested for assault by an ex-girlfriend and "had to prove [her] innocence and try to convince the judge that [the ex-girlfriend] had fabricated the story."   As to how she felt about this experience, Sarah explained: "I feel that anyone can be accused of something they didn't do and are treated like a criminal even when the police report states otherwise."

Defendants contend the two grounds mentioned by the prosecutor, although supported by the questionnaire responses, were not in fact what motivated the challenge.  They point to the fact the prosecutor failed to ask Sarah H. any questions about these two items and failed to challenge other jurors who had had negative experiences with law enforcement.   In addition, defendants point out "the prosecutor completely ignored other significant grounds which were likely sufficient to support a challenge for cause . . . ."  For example, Sarah indicated in her questionnaire that she "can never say someone is guilty unless [she has] personally witnessed them commit the crime."  She expressed a belief "that law enforcement operates by racial profiling" and indicated she did not believe she could be "open minded to judging a stranger."   According to defendants, the prosecutor's failure to mention these other potential grounds for challenge "is consistent with the conclusion that the strike was motivated by a discriminatory purpose rather than an assessment of the relevant characteristics of the prospective juror."

As discussed above, the fact the prosecutor did not also challenge Jurors No. 1 and 11, who had had negative experiences with law enforcement, does not render the prosecutor's use of this factor in challenging Sarah H. suspect.   Those other jurors had other questionnaire responses that suggested a pro-prosecution or pro-victim bias.  And as for the prosecutor's failure to question Sarah, such questioning is unnecessary if the questionnaire response provides sufficient information.   Sarah was fairly clear in her questionnaire responses regarding the nature of the prior incidents.

As for the prosecutor's failure to mention other valid grounds for excusing Sarah H., we note that the hearing on defendants' *Wheeler/Batson* motion took place the morning after the prosecutor made the various peremptory challenges at issue here.  When asked to comment on the basis for the challenges, the prosecutor began: "It might take me a minute because I took out this morning all of my Post–It notes in all the areas in justifying these particular areas." In other words, the prosecutor no longer had the notes she used the day before to assist her in deciding who to challenge.  Therefore, it is not surprising that the prosecutor might not recall all of the grounds she used to warrant each of the challenges, and no particular inference should be drawn from this circumstance.

We conclude the record supports the prosecutor's peremptory challenge of Sarah H.

21

**Prospective Juror Maria C.**

The next potential juror to be challenged by the prosecution was Maria C.  The prosecutor explained she was concerned with Maria's response to a question about aider and abettor liability.  That question asked: "The law says that someone who aids or abets a crime is equally liable for having committed that offense.  Is there anyone who has a problem with the concept of law that holds someone who aids, facilitates, promotes, encourages, or instigates a crime is equally liable for having committed that crime?"  Maria answered "yes" and explained: "[T]hey can be lying and blaming someone else."

During voir dire, the prosecutor questioned Maria C. about this questionnaire response as follows:

"Ms. [C.], with regard to your questions on aiding and abetting, you indicated that you do have a problem with the concept that somebody who aids and abets a crime as being each legally liable for that crime.  Is that a fair reading of your answer?

"A. I am not sure.  I didn't understand that question really.

"Q. If the law were to tell you that helping or promoting or encouraging a crime that is committed, you are responsible for that crime that was committed, even if you are not the person who actually committed it.  Do you have a problem with that?

"A. No.

"Q. And is that with regards to any type of crime or would you compartmentalize?

"In other words, do you know what I mean by that?  Would you follow the law with regards to that?

"A. Yes.

"Q. And would you follow the law on everything?

"A. Yes."

Defendants contend the questionnaire response, when viewed in light of the voir dire answers, does not reflect confusion over the concept of aiding and abetting but confusion over the wording of the question itself and a concern that one defendant may be lying in order to get someone else in trouble.  They further argue Maria C. provided other questionnaire responses that reflect a pro-prosecution bias, and the prosecutor failed to excuse another potential juror, Henry B., who likewise answered "yes" to the question whether anyone has a problem with aiding and abetting liability.

We agree the wording of the question could have been clearer. Read literally, the question asked whether "anyone" had a problem

with aiding and abetting liability.  It may reasonably be assumed there is someone in the world who has a problem with holding an aider and abettor equally liable for a crime.  But it does not appear Maria C. read the question literally.  She expressed a concern that one defendant may point the finger at another to get the other in trouble without any basis in fact.  This, of course, could be a potential concern for the prosecution, which intended to use the testimony of one of the perpetrators against the others.  Thus, Maria's response raised less of a concern about her willingness to hold aiders and abettors equally liable than a concern with her willingness to accept the testimony of a coconspirator.

As for other questionnaire responses that purportedly reveal a pro-prosecution bias, we do not share defendants' interpretation of those responses.  Maria C. answered "yes" to the question whether a police officer's testimony will be more truthful than that of a civilian witness.  She explained: "Sometimes the police either have seen what the civilian done [sic] or has a witness for proof."  Aside from the incoherence of this explanation, it does not appear to reveal a pro-police bias so much as a belief that police may be more truthful simply because they either saw what happened themselves or have a corroborating witness.  In other words, it is not that police officers are more truthful, it is just that they often have more first-hand knowledge.

In response to a question about whether the fact charges have been filed against the defendants causes her to conclude they are more likely guilty than not guilty, Maria C. answered "yes," but explained, "because depending on what that person has done."  This explanation makes no sense in the context and, therefore, provides little or no guidance on the issue.

Maria C. indicated the testimony of one witness would be enough for a conviction, but then followed up by answering "yes" to the question whether she would require additional evidence to corroborate the testimony of a witness.  Likewise, Maria expressed a belief that cases of sexual assault are over-reported but then explained that such cases are nevertheless important and that the law regarding sexual assault "could be a little too weak."  In our view, the foregoing responses do not reveal a pro-prosecution or anti-prosecution bias.

Finally, as to the prosecutor's failure to excuse Henry B., who also answered "yes" to the question about anyone having a problem with aider and abettor liability and explained that "[t]his will very [sic] from case to case," we note that defendants themselves excused Henry B. just before the prosecutor excused Maria C.  Hence, we have no way of knowing if the prosecutor would have challenged Henry B. as well.

We conclude the record supports the prosecutor's peremptory challenge to Maria C.

23

**Prospective Juror Monica V.**

The last potential juror to be excused by the prosecution before the *Wheeler/Batson* motion was Monica V. The prosecutor identified the following factors informing her decision: (1) Monica is young; (2) she has no children; (3) a police officer once battered her father; and (4) she believes someone who accepts a ride from strangers is responsible for what happens to them. According to the questionnaire, Monica was 26 years old and had no children. She explained the incident with her father as follows: "A police officer battered my dad in Los Angeles . . . he sat my dad in hot the curb [sic] and my dad was wearing shorts my dad slide front [sic] to try to move from the hot curb and the police hit my dad really bad." She answered "yes" to the question whether she believes one who accepts a ride from a stranger is responsible for whatever happens to them, and explained: "Because you decided to accept the ride so you are responsible if anything happens."

Defendants contend the factors cited by the prosecutor did not in fact motivate the peremptory challenge, inasmuch as the prosecutor failed to challenge non-Hispanic jurors who were young and had no children, had had negative experiences with law enforcement, or indicated that a person who accepts a ride from a stranger is responsible for what happens to them. However, while it may be true that the prosecutor failed to excuse certain jurors whose questionnaire responses revealed circumstances similar to Monica V. as to age, lack of children, prior experiences with law enforcement, or responsibility of one who accepts a ride from a stranger, defendants cite no juror who had the same combination of these factors.

While comparative juror analysis is certainly relevant in assessing the third step of the *Wheeler/Batson* analysis, "'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' [Citation.]" (*People v. Taylor* (2009) 47 Cal.4th 850, 887.)

We cannot say on the record before us that the trial court erred in concluding the prosecutor utilized a valid, race-neutral rationale for excusing Monica V. We therefore conclude the trial court did not err in denying defendants' *Wheeler/Batson* motion.

*Sanchez*, 2011 WL 3806264, at **4-12.

/////

24

## 2. <u>Legal Standards Regarding Petitioner's Batson Claim</u>

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. *See Batson*, 476 U.S. at 79; *Johnson*, 545 U.S. at 62. So-called *Batson* claims are evaluated pursuant to a three-step test:

> First, the movant must make a prima facie showing that the prosecution has engaged in the discriminatory use of a peremptory challenge by demonstrating that the circumstances raise "an inference that the prosecutor used [the challenge] to exclude veniremen from the petit jury on account of their race." [Citation omitted.] Second, if the trial court determines a prima facie case has been established, the burden shifts to the prosecution to articulate a [gender]-neutral explanation for challenging the juror in question. [Citation omitted.] Third, if the prosecution provides such an explanation, the trial court must then rule whether the movant has carried his or her burden of proving the existence of purposeful discrimination.

*Tolbert v. Page*, 182 F.3d 677, 680 (9th Cir. 1999) (en banc).

In order to establish a prima facie case of racial discrimination, petitioner must show that "(1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race." *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006) (citing *Batson*, 476 U.S. at 96 and *Cooperwood v. Cambra*, 245 F.3d 1042, 1045-46 (9th Cir. 2001)). A prima facie case of discrimination "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson*, 545 U.S. at 169 (quoting *Batson*, 476 U.S. at 94.) Both Hispanics and African-Americans constitute cognizable groups for *Batson* purposes. *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002).

At the second step of the *Batson* analysis, "the issue is the facial validity of the prosecutor's explanation." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Id.* at 360. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Stubbs v. Gomez*, 189

25

1   F.3d 1099, 1105 (9th Cir. 1999) (quoting *Hernandez*, 500 U.S. at 360).  For purposes of step two,

2   the prosecutor's explanation need not be "persuasive, or even plausible."  *Purkett v. Elem*, 514

3   U.S. at 765, 768 (1995).  Indeed, "to accept a prosecutor's stated nonracial reasons, the court need

4   not agree with them."  *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006).

5          In the third step of a *Batson* challenge, the trial court has "the duty to determine whether

6   the defendant has established purposeful discrimination," *Batson*, 476 U.S. at 98, and, to that end,

7   must evaluate the "persuasiveness" of the prosecutor's proffered reasons.  *See Purkett*, 514 U.S.

8   at 768.  In determining whether petitioner has carried this burden, the Supreme Court has stated

9   that "a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of

10  intent as may be available.'"  *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Hous.*

11  *Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Hernandez*, 500 U.S. at 363.  "[A]ll of the

12  circumstances that bear upon the issue of racial animosity must be consulted."  *Snyder v.*

13  *Louisiana*, 552 U.S. 472, 478 (2008).  *See also Cook v. Lemarque*, 593 F.3d 810, 814 (9th Cir.

14  2010) (citation and internal quotation marks omitted) (stating the "totality of the relevant facts"

15  should be considered "to decide whether counsel's race-neutral explanation . . . should be

16  believed.").  In step three, the court "considers all the evidence to determine whether the actual

17  reason for the strike violated the defendant's equal protection rights."  *Yee v. Duncan*, 463 F.3d

18  893, 899 (9th Cir. 2006).

19         A prosecutor's reasons for striking a juror may be "founded on nothing more than a trial

20  lawyer's instincts about a prospective juror . . . so long as they are the actual reasons for the

21  prosecutor's actions."  *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (quoting *United*

22  *States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)).  "Excluding jurors because of their

23  profession, or because they acquitted in a prior case, or because of a poor attitude in answer to

24  voir dire questions is wholly within the prosecutor's prerogative."  *United States v. Thompson*,

25  827 F.2d 1254, 1260 (9th Cir. 1987).  It is not improper for a prosecutor to rely on his instincts

26  with respect to the voir dire process.  *See Power*, 881 F.2d at 740 (9th Cir. 1989) (quoting

27  *Chinchilla*, 874 F.2d at 699).  In short, instinct and subjective factors have a legitimate role in the

28  /////

26

1   jury selection process.  *Miller-El*, 545 U.S. at 252; *Burks*, 27 F.3d at 1429, n.3 ("peremptory

2   strikes are a legitimate means for counsel to act on . . . hunches and suspicions").

3        The defendant in the criminal prosecution bears the burden of persuasion to prove the

4   existence of unlawful discrimination.  *Batson*, 476 U.S. at 93.  "This burden of persuasion 'rests

5   with, and never shifts from, the opponent of the strike.'"  *Johnson*, 545 U.S. at 2417 (quoting

6   *Purkett*, 514 U.S. at 768).

7        "Any constitutional error in jury selection is structural and is not subject to harmless error

8   review."  *Williams v. Runnels*, 640 F.Supp.2d 1203, 1210 (C.D. Cal. 2010) (citing *Windham v.*

9   *Merkle*, 163 F.3d 1092, 1096 (9th Cir. 1998) and *Turner v. Marshall*, 121 F.3d 1248, 1254 n.3

10  (9th Cir. 1997).  *See also Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (stating that among those

11  constitutional rights so basic "that their infraction can never be treated as harmless error" is a

12  defendant's "right to an impartial adjudicator, be it judge or jury") (citation and internal

13  quotations omitted); *Williams v. Woodford*, 396 F.3d 1059, 1072 (9th Cir. 2005) ("because a

14  *Batson* violation is structural error, actual harm is presumed to have resulted from the alleged

15  constitutional violation").

16               **3.  <u>Analysis</u>**

17       This court need not address the preliminary issue of whether petitioner established a prima

18  facie case of purposeful discrimination because both the state trial and appellate courts ruled on

19  the ultimate question of intentional discrimination under the *Batson* analysis.  *Hernandez*, 500

20  U.S. at 359; *United States v. Gillam*, 167 F.3d 1273, 1278 (9th Cir. 1999).  The trial judge

21  apparently concluded that petitioner established a prima facie case of racial discrimination

22  because he asked the prosecutor to respond to defendants' *Batson* motion.  RT at 105.  The sole

23  issue before this court, therefore, is whether the California courts unreasonably concluded that

24  petitioner failed to meet his ultimate burden of establishing that the prosecutor's challenges were

25  motivated by racial discrimination under the third step of the *Batson* analysis.

26       In evaluating habeas petitions premised on step three of a *Batson* violation, the standard of

27  review is "doubly deferential: unless the state appellate court was objectively unreasonable in

28  concluding that a trial court's credibility determination was supported by substantial evidence, we

1   must uphold it." *Jamerson v. Runnels,* 713 F.3d 1218, 1225 (9th Cir. 2013) (citations omitted).

2   This court can only grant petitioner's *Batson* claim "if it was unreasonable to credit the

3   prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333,

4   338 (2006). In this case, when asked, the prosecutor expressed a neutral, reasonable basis for the

5   use of her peremptory challenges of all five of the Hispanic jurors. RT at 105-07. The

6   prosecutor's reasons were "clear and reasonably specific" and were "related to the particular case

7   to be tried." *Purkett*, 514 U.S. at 768-69. They are also supported by the record. The California

8   Court of Appeal analyzed each juror's answers to the juror questionnaire, the prosecutor's voir

9   dire of each stricken juror, and the characteristics of other similar jurors who were not stricken.

10  After a thorough comparison, the court concluded that the record supported a race-neutral basis

11  for each strike. This court has also reviewed the record and agrees with the characterization of

12  the Court of Appeal with respect to the characteristics of the other jurors on the panel who were

13  not stricken by the prosecutor.

14      It is true that the fact one or more of the prosecutor's proffered reasons for striking the

15  Hispanic jurors also applied to other jurors who were not stricken is "evidence tending to prove

16  purposeful discrimination to be considered at *Batson*'s third step." *Miller-El*, 545 U.S. at 241.

17  However, the fact that an excused juror shares one or more characteristics with seated jurors does

18  not end the inquiry into discrimination in jury selection, nor does it establish that the prosecutor

19  was acting with discriminatory intent. Rather, the court must evaluate the "totality of the relevant

20  facts" to decide whether "counsel's race-neutral explanation for a peremptory challenge should be

21  believed." *Ali v. Hickman*, 584 F.3d 1174, 1180 (9th Cir. 2009). For the reasons stated by the

22  California Court of Appeal, the similarities between the stricken jurors and several of the seated

23  jurors do not undermine the prosecutor's stated reason for excusing the five Hispanic jurors.

24      This court also notes that petitioner's jury did contain one Hispanic juror, a fact relevant

25  although not decisive. "The fact that African-American jurors remained on the panel 'may be

26  considered indicative of a nondiscriminatory motive.'" *Gonzalez v. Brown*, 585 F.3d 1202, 1210

27  (9th Cir. 2009) (quoting *Turner v. Marshall*, 121 F.3d 1248, 1254 (9th Cir. 1997)). *See also*

28  *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994) (fact that jury contained an African-American

1   member is "a valid, though not necessarily dispositive, consideration in determining whether a

2   prosecutor violated *Batson*").

3       After reviewing the record, this court concludes that the state court's disposition of

4   petitioner's *Batson* claim is not contrary to or an unreasonable application of clearly established

5   federal law nor did it result in a decision that is based on an unreasonable determination of the

6   facts in light of the evidence presented in the state court proceeding.  The record reflects that the

7   state trial judge performed an adequate evaluation of the prosecutor's reasons for challenging the

8   Hispanic jurors and appropriately denied petitioner's *Batson/Wheeler* motion.  This court agrees

9   with the state court that the prosecutor's stated reasons for her exclusion of five Hispanic jurors

10   were her genuine reasons for exercising a peremptory strike, rather than a pretext invented to hide

11   purposeful discrimination.  Petitioner has failed to carry his burden of proving the existence of

12   unlawful discrimination with respect to the prosecutor's challenge to these jurors.  Accordingly,

13   he is not entitled to relief on this claim.

14       **C.  Violation of Right to Confrontation/Trial Severance**

15       Petitioner next claims that the trial court's denial of his motion for a trial severance and

16   the admission at a joint trial of his redacted statements to police violated his right to a fair trial

17   and to confront the witnesses against him.  ECF No. 23 at 22-23.  He specifically complains that

18   exculpatory statements he made to the police regarding the victim's willingness to get into his

19   car, which would have negated the kidnapping charge, and her willingness to smoke marijuana,

20   which would have impacted her credibility, were redacted from the statements that were

21   introduced at his trial.  Petitioner argues that the redaction prevented the jury from hearing his

22   explanation for the victim's actions and "made it appear that he had merely been evasive when

23   given an opportunity to explain."  *Id.* at 22.  Petitioner explains:

24           During Petitioner's pretrial statement, Petitioner explained that [the
        victim] had *consented* to ride with *us* and smoke marijuana.  As

25           redacted, Petitioner's *statement* was *stripped* of this explanation of
        how he came to drive S.L., with her consent, to the remote location.

26           The explanation came in response to *police questions* on that point
        and the jury would have expected the explanation to be offered at

27           that time.

28

1
2

> Petitioner's statement *made it appear* that he had merely been *evasive* when given an opportunity to explain.  As provided to the jury, Petitioner's *exculpatory* statement became *inculpatory.*

3   ECF No. 37 at 14.  Petitioner argues that the fact his "exculpatory" statements became

4   "inculpatory" after the redaction constitutes "'clear' evidence of a sure *Aranda/Bruton* violation."

5   *Id.*  He contends that the trial court's failure to sever his trial from the trial of his co-defendants or

6   to allow the introduction of his full statements to police was prejudicial error.  ECF No. 23 at 23.

7        Petitioner also argues that the admission into evidence of Edgar Radillo's redacted

8   statements to the police violated his right to confront the witnesses against him, as set forth in

9   *Bruton v. United States*, 391 U.S. 123 (1968), *People v. Aranda*, 63 Cal.2d 518 (1965), and

10   *Crawford v. Washington*, 541 U.S. 36 (2004).

11   **1. State Court Decision**

12        Following the defendants' arrests, each was interviewed by the police and the interviews

13   were tape recorded.  The prosecution sought to introduce the interview tapes at defendants' joint

14   trial.  The California Court of Appeal observed that under the Sixth and Fourteenth Amendments

15   to the United States Constitution, a criminal defendant has a right "to be confronted with the

16   witnesses against him."  *Sanchez*, 2011 WL 3806264, at *12 (citing U.S. CONST., amend. VI, and

17   *Pointer v. Texas,* 380 U.S. 400 (1965)).  The court noted that the "central concern" of this right is

18   "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous

19   testing in the context of an adversary proceeding before the trier of fact."  *Sanchez*, *id.* (citing

20   *Maryland v. Craig* 497 U.S. 836, 845 (1990)).  It also noted that the Confrontation Clause applies

21   to hearsay statements that are "'testimonial' in nature, including statements made during police

22   interrogation.'"  *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36 (2004) (*Crawford*)).  It also

23   acknowledged that such hearsay may be admitted at trial only if the declarant is unavailable and

24   the defendant has had a previous opportunity to cross-examine the declarant.  *Id.*  The petitioner

25   argued that the trial court should have severed the trials because of the cross-incrimination of the

26   defendants' out-of-court statements and that the failure to do so violated petitioner's right of

27   confrontation under the Sixth Amendment.  The California Court of Appeal rejected that

28   argument, reasoning as follows:

In *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), the California Supreme Court held that when the prosecution seeks to introduce an extrajudicial statement of one defendant that implicates other defendants, the trial court has three options: (1) in a joint trial, delete any direct or indirect identification of codefendants from the statement; (2) grant a severance; or (3) if severance is denied and effective deletion is impossible, exclude the statement altogether. (*Id.* at pp. 530–531.)  In *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), the United States Supreme Court held that introduction of an incriminating extrajudicial statement by a codefendant violates the defendant's confrontation right, even where the jury is instructed to disregard the statement in determining the defendant's guilt or innocence.

Edgar moved in limine to exclude the pretrial statements of his codefendants.  He argued any statements by the other defendants implicating him would have to be redacted in a joint trial and, therefore, the court had three options: (1) separate trials, (2) redaction, or (3) separate juries.  Edgar further argued "there is no reasonable means by which the People can redact the statements" of the other defendants.  By inference, Edgar argued that if the court was inclined to admit the pretrial statements, it was required either to sever or to use separate juries.  Israel and Alberto joined in Edgar's motion.

The trial court refused to sever the defendants' trials and, apparently, did not consider using separate juries.  Thus, the court relied on redaction to protect defendants' constitutional rights.  The court instructed the jury that the pretrial statements of a given defendant could only be considered as evidence against that defendant.

Defendants present a multi-pronged attack on the trial court's decision to try them jointly and to permit introduction of redacted versions of their out-of-court statements.  They contend the court had essentially two choices, separate trials or exclusion of the statements altogether.  They argue the redacted versions of the custodial interviews did not adequately eliminate references to codefendants, as required by *Aranda/Bruton*.  Israel further argues the court erred in excluding from his custodial interview various exculpatory statements, which he was entitled to have admitted in evidence.  As we shall explain, we find no abuse of discretion in denying defendants' motion to sever or in admitting redacted versions of defendants' out-of-court statements.

"When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order [sic] separate trials."  (§ 1098.)  Under this provision, the Legislature has stated a preference for joint trial of codefendants charged with the same offense.  At the same time, the trial court retains discretion to grant separate trials.  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1286.)

"The court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with

31

codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*People v. Turner* (1984) 37 Cal.3d 302, 312, *overruled on other grounds* in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149–1150.)  "Whether denial of a motion to sever the trial of a defendant from that of a codefendant constitutes an abuse of discretion must be decided on the facts as they appear at the time of the hearing on the motion rather than on what subsequently develops."  (*People v. Isenor* (1971) 17 Cal.App.3d 324, 334.)

Defendants contend the trial court erred in failing to sever their trials.  However, the only ground asserted for separate trials was the cross-incrimination of defendants' out-of-court statements.  This is also the basis for defendants' separate contention that the trial court erred in admitting redacted versions of those statements.  Thus, the resolution of both issues turns on whether the redacted versions of defendants' out-of-court statements eliminated any cross-incrimination.

In *Bruton*, two defendants – Evans and Bruton – were tried jointly for robbery.  Evans did not testify, but the prosecution introduced into evidence Evans's confession in which he stated he and Bruton committed the robbery.  (*Bruton*, 391 U.S. at p. 124.)  The trial judge instructed the jury it could consider the confession only as evidence against Evans.  (*Id* . at p. 125)  The United States Supreme Court held that, despite the limiting instruction, the introduction of Evans's out-of-court confession violated Bruton's Sixth Amendment right to cross-examine witnesses.  (*Id.* at p. 137.)

In *Richardson v. Marsh* (1987) 481 U.S. 200 (*Richardson*), Marsh and Williams were jointly tried for murder and the prosecution introduced a redacted confession by Williams that omitted all references to Marsh and all indications that anyone other than Williams and a third person named Martin participated in the crime.  (*Id.* at p. 202–203.)  The trial court instructed the jury not to consider the confession against Marsh.  (*Id.* at p. 205.)  As redacted, the confession indicated Williams and Martin had discussed the murder in the front seat of a car while they traveled to the victim's home.  (*Id.* at pp. 203–204.)  However, later in the trial, Marsh testified that she was in the back seat of the car at the time.  (*Id.* at p. 204.)

The Supreme Court held the redacted confession of Williams fell outside the scope of *Bruton* and was admissible (with an appropriate limiting instruction).  The court distinguished the confession in *Bruton* as one that was "incriminating on its face," and had "expressly implicat[ed]" Bruton. (*Richardson*, 481 U.S. at p. 208.)  By contrast, Williams's confession in *Richardson* amounted to "evidence requiring linkage" in that it "became" incriminating in respect to Marsh "only when linked with evidence introduced later at trial." (*Ibid.*)  According to the court: "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only

the defendant's name, but any reference to his or her existence." (*Id.* at p. 211.)

In *Gray v. Maryland* (1998) 523 U.S. 185 (*Gray*), Gray and Bell were tried jointly for the murder of Stacey Williams. Bell did not testify at trial. However, the trial court permitted the prosecution to introduce a redacted version of Bell's confession. In the original, Bell indicated he, Gray and a third person, Vanlandingham, participated in the beating that led to Williams's death. The police detective who read the confession into evidence substituted the word "deleted" or "deletion" wherever the names of Gray and Vanlandingham appeared. Immediately after the redacted confession was read to the jury, the prosecutor asked, "after he gave you that information, you subsequently were able to arrest Mr. Kevin Gray; is that correct?" The officer responded, "That's correct." (*Id.* at pp. 188–189.) The prosecution produced other witnesses who said that six persons, including Bell, Gray, and Vanlandingham, participated in the beating. The trial judge instructed the jury that the confession was evidence against Bell alone. (*Id.* at p. 189.)

The Supreme Court concluded the redaction was inadequate under the circumstances because, although the names of the other participants were eliminated, the redacted version continued to refer directly to the existence of the nonconfessing defendant. (*Gray, supra*, 523 U.S. at p. 192.) The court explained: "Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that, in our view, the law must require the same result." (*Id.* at p. 192.) According to the court: "*Bruton*'s protected statements and statements redacted to leave a blank or some other similarly obvious alteration, function the same way grammatically. They are directly accusatory. Evans' statement in *Bruton* used a proper name to point explicitly to an accused defendant . . . . The blank space in an obviously redacted confession also points directly to the defendant, and it accuses the defendant in a manner similar to Evans' use of Bruton's name or to a testifying codefendant's accusatory finger. By way of contrast, the factual statement at issue in *Richardson* – a statement about what others said in the front seat of a car – differs from directly accusatory evidence in this respect, for it does not point directly to a defendant at all." (*Id.* at p. 194.)

In *Gray*, the Supreme Court noted that *Richardson* placed outside the scope of *Bruton* those statements that incriminate inferentially. (*Gray, supra*, 523 U.S. at p. 195.) However, the court cautioned that not all such statements fall outside *Bruton*. According to the court: "[I]nference pure and simple cannot make the critical difference, for if it did, then *Richardson* would also place outside *Bruton*'s scope confessions that use shortened first names, nicknames, descriptions as unique as the 'red-haired, bearded, one-eyed man-with-a-limp,' [citation], and perhaps even full names of defendants who are always known by a nickname. This Court has assumed, however, that nicknames and specific descriptions fall

inside, not outside, *Bruton*'s protection. [Citation.] . . . [¶]   That being so, *Richardson* must depend in significant part upon the kind of, not the simple fact of, inference. *Richardson*'s inferences involved statements that did not refer directly to the defendant himself and which became incriminating 'only when linked with evidence introduced later at trial.' [Citation.]   The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." (*Id.* at pp. 195–196.)

Defendants point to a number of statements in the redacted versions of their interview statements that, they argue, continue to implicate the others in the crimes.   Thus, they contend, introduction of the redacted versions violated *Aranda/Bruton*.   We shall consider the interview statements of each defendant in turn.

**Israel Sanchez**

In his interview with police, Israel initially denied ever being in Davis, but then acknowledged that he was in Davis around 11:00 p.m. in his car and saw a "drunk ass girl" come out of one of the bars.   Israel told the officers the woman got in his car, asked for "weed" and then they went cruising.   He initially denied having sex with her, claiming instead that he had masturbated while standing behind her.   He initially denied using a condom but then said that he had.   Later, Israel admitted lying on top of the girl and attempting to have sexual intercourse with her.   However, he claimed not to have been able to penetrate her.   Later, Israel admitted that he was able to penetrate her "a little bit."   He denied striking the woman.   Finally, Israel acknowledged that Antonio was in the car when this was occurring.

After explaining that the woman got in the car, asked for "weed," wanted to go home, but then wanted to cruise, Israel said: "So *we* cruised around in the fuckin cutties [FN1] and stuff.   After that *we* post because I guess she wanted to throw up and stuff, she wasn't feeling well so *we* got out of the car and then she was about to throw up but she didn't.   And she was just saying 'I don't feel well.'"   (Italics added.)

FN1.   The term "cutties" in this context "Refers to an area far away in distance or in the middle of nowhere."   (Urban Dict. (1999–2011) <http:// www.urbandictionary.com/define.php?term=Cutties> [as of Aug. 30, 2011].)

Defendants argue the foregoing statement implicated them because, by the time the jury heard it, evidence had already been presented that both Edgar and Alberto were also in the car with Israel, Antonio and S.L. and, therefore, they fell within the reference to "we."

It is readily clear Israel's statement that "we" cruised around and "we" got out of the car did not implicate Edgar or Alberto on its

face, especially when Israel had previously indicated that both Antonio and the victim were with him in the car and he did not mention anyone else.  The fact that the statement may implicate the others, when considered in conjunction with other evidence placing Edgar and Alberto in the car, does not bring the statement within the scope of *Aranda/Bruton*.  (*Richardson, supra*, 481 U.S. at p. 208.)

Defendants contend the foregoing evidence is "remarkably similar" to that in *People v. Song* (2004) 124 Cal.App.4th 973, where this court found a violation of *Aranda/Bruton*.   Defendants are mistaken.  In *Song*, a detective testified that one defendant told him he saw a codefendant force the victim into the car.  (*Song*, at p. 979.)  The People conceded error but argued it was not prejudicial.  (*Id.* at p. 981.)

*Song* is clearly distinguishable from the present matter.  In *Song*, the codefendant's statement implicated the defendant directly by name, whereas in the present matter Israel's statement did not mention the codefendants by name or suggest the presence of any unidentified perpetrators at the time of the offenses.   Only by reference to other evidence could the "we" mentioned by Israel be considered to include Edgar and Alberto.

Defendants also take issue with a statement made by Israel about smoking marijuana.  When asked how much marijuana he smoked that evening, Israel answered: "Um I think *we* had like two blunts yeah *we* only had like two blunts rolled up."  (Italics added.)  He was then asked if he handed a blunt to S.L., and Israel answered: "No *we* were just rotating."  (Italics added.)

Again, there is no direct reference to either Edgar or Alberto or any unidentified persons being present, and the "we" can easily be interpreted as referring to Israel, Antonio and S.L.  Edgar and Alberto are implicated only by virtue of other evidence placing them in the car at the time.  Under *Richardson*, this falls outside of *Aranda/Bruton*.

Finally, defendants take issue with a number of statements made by Israel that amounted to admissions by him that he committed the various charged crimes.   For example, defendants cite Israel's admission that, while lying on top of S.L., he attempted to penetrate her for six to seven minutes.  They further cite Israel's statement that S.L. told him to stop and she was too drunk to fight back.  Defendants argue that, by implicating himself in a forcible rape, as alleged in count 2, Israel also implicated them as aiders and abettors in that crime as well as rape in concert, as alleged in count 3.  Defendants further argue these statements negated their own assertions at trial that S.L. had gone with them voluntarily and had engaged in consensual sex.

Defendants seek to stretch *Aranda/Bruton* far beyond its legal bounds.   The evil those cases seek to avoid is the admission of statements by one defendant that identify another defendant, either directly or indirectly, as having been involved in the crime without

that other defendant having an opportunity to test those statements through cross-examination. *Aranda/Bruton* does not seek to keep out all statements by one defendant that might somehow prove to be harmful to another defendant once that other defendant's participation in the crimes is established through other evidence. In this instance, Israel's statements implicating himself alone would have an adverse impact on the other defendants as aiders and abettors only if Israel also identified those others as having participated. However, such participation was established through other evidence. Under *Richardson*, introduction of Israel's statements did not violate the confrontation rights of these other defendants.

* * *

**Edgar Radillo**

Edgar first denied having been in Davis at any time during the past year, but then admitted recently picking up a girl in Davis. According to Edgar, when they arrived at the crime scene, "She gets out of the car screaming" and "started tripping out saying she was going to call the cops." Edgar claimed that, after they arrived at the scene, he stayed in the car with Antonio and denied touching S.L. However, Edgar later admitted putting a condom on and intending to have sexual intercourse with her. But, according to Edgar, he changed his mind and took the condom off. He denied ever getting on top of S.L. but then admitted doing so and rubbing his penis on her. He at first denied penetrating S.L. but then acknowledged having done so once. Edgar denied getting into S.L.'s purse but then admitted taking the condom from the purse. He identified Antonio as being present and asserted that Antonio remained in the car the whole time.

After acknowledging that he picked a girl up off the street in Davis, Edgar indicated he talked to her and she said "she was going to the university or something." The following colloquy ensued:

"DETECTIVE HERNAN OVIEDO: Okay. What else did you guys talk about in the car?

"EDGAR RADILLO: Nothing she just talked about uh well what we were going to do with our life that she had something but I don't know stuff. She was telling me about her life. That she don't like white guys and I don't know she was telling me.

"DETECTIVE HERNAN OVIEDO: Were you guys drinking in the car?

"EDGAR RADILLO: No she was already drunk. We didn't drink at all."

Defendants contend that, by the time Edgar's interview tape was played, the jury was already aware Alberto and Israel were in the car with Edgar, Antonio and S.L. Thus, the foregoing implicated them in the offenses despite the use of the neutral pronoun "we."

However, as explained earlier, the fact that evidence outside of an out-of-court statement can be used to link unnamed defendants to the statement does not implicate *Aranda/Bruton*.  In the context where Edgar had just explained that he and S.L. were talking to each other in the car, the officer's questions about "you guys" and Edgar's statement that "we" didn't drink could reasonably be viewed as referring to Edgar and S.L. alone.  Only when coupled with other evidence outside the interview, are Israel and Alberto arguably implicated.

The same goes for Edgar's statement shortly thereafter about how S.L. jumped out of the car and was "tripping out:  "We were already out in the cuts[FN2] we didn't know where we going.  I don't even know the cuts.  I was lost.  And then we just ended up somewhere.  And then she started tripping out saying she was going to call the cops and I don't know."  The "we" there could easily have referred to Edgar, Antonio, and S.L., whom Edgar acknowledged were present.  Only by reference to evidence outside Edgar's interview are Israel and Alberto implicated.

FN2. In this context "cuts" means, "A term to describe a remote area that is either hidden, distant, or both."  (Urban Dict. (1999–2011) <http:// www.urbandictionary.com/define.php?term=cuts & page=2> [as of Aug. 30, 2011].

Likewise, Edgar's statement that "[n]obody" helped S.L. out of the car and over to where she was sexually assaulted did not refer to either Israel or Alberto and did not suggest anyone else was present besides Edgar and Antonio.

The remaining statements defendants cite as violating *Aranda/Bruton* all implicated Edgar alone in the crimes.  As with Israel's statements of a similar nature, defendants argue that by implicating himself in a rape, Edgar likewise adversely impacted their consent defenses.  However, as with Israel's statements, Edgar's self-implication is only adverse to Israel and Alberto if other evidence outside Edgar's interview placed them at the scene.  Under these circumstances, there is no *Aranda/Bruton* error.  (*Richardson, supra*, 481 U.S. at p. 208.)

**Alberto Sanchez**

Apparently, the prosecution concluded it could not redact Alberto's pretrial interview sufficiently to present it at trial.  Instead, Alberto's pretrial statements were presented through the testimony of the questioning officer.  Alberto admitted picking up S.L. but denied touching her.  Then he admitted shaking hands with her and touching her clothing.  Alberto claimed S.L. got into the car willingly and asked for marijuana.  He also admitted touching a condom and a pair of panties.

Defendants contend two of Alberto's statements came in that referred to "they" as having done something, as in "they" went to the "cutties" and, as Alberto was holding S.L. up while she threw up, "they" came over.  The remaining statements to which

defendants object all implicated Alberto alone in the offenses, and the others by implication as aiders and abettors. However, as discussed above, none of these statements violated *Aranda/Bruton*. The use of "they" implicates the others only when coupled with evidence outside of Alberto's statements, and the self-incriminating statements do not fall within *Aranda/Bruton* even if they might ultimately harm the others.

Furthermore, Alberto eventually testified at trial and was therefore available for cross-examination by the other defendants. Defendants contend this does not matter, because at the time the officer testified about what Alberto said, Alberto had not yet testified and therefore was unavailable as a witness and could not be cross-examined on his out-of-court statements. But we fail to see what the timing of defendants' opportunity to cross-examin[e] Alberto about his out-of-court statements has to do with it. The ability to cross-examination is the ability to cross-examine, whenever it occurs. *Aranda/Bruton* is not implicated if the declarant is available at trial.

Defendants claim introduction of the pretrial interview statements of each of them violated *Crawford*, even if those statements did not implicate them directly. In *Crawford*, the United States Supreme Court "repudiated [its] prior ruling in *Ohio v. Roberts* (1980) 448 U.S. 56, under which an unavailable witness's statements were admissible against a criminal defendant if the statement bore 'adequate "indicia of reliability."' [Citation.] . . . *Crawford* held that out-of-court statements by a witness that are testimonial are barred under the Sixth Amendment's confrontation clause unless the witness is shown to be unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the trial court." (*People v. Monterroso* (2004) 34 Cal.4th 743, 763.)

There is no question the interview statements of defendants were testimonial within the meaning of *Crawford* and, at least as to Edgar and Israel, the declarants were unavailable as witnesses. However, "*Crawford* addressed the introduction of testimonial hearsay statements against a defendant." (*People v. Stevens* (2007) 41 Cal.4th 182, 199, italics added.) As explained above, none of defendants' interview statements admitted at trial contained evidence against any of the others. Thus, they did not implicate the confrontation clause. (*Ibid.*) "The same redaction that 'prevents *Bruton* error also serves to prevent *Crawford* error.'" (*Ibid.*; *accord, People v. Song, supra,* 124 Cal.App.4th at p. 984.)

*Sanchez*, 2011 WL 3806264, at **12-19.

## 2. Applicable Legal Standards

### a. Severance

A court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial.

38

*Zafiro v. United States*, 506 U.S. 534, 538-39 (1993) (court must decide if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991) (same); *see also Comer v. Schiro*, 480 F.3d 960, 985 (9th Cir. 2007) (in the context of the joinder of counts at trial, habeas relief will not be granted unless the joinder actually rendered petitioner's state trial fundamentally unfair and therefore violative of due process).  Petitioner bears the burden of proving that the denial of severance rendered his trial fundamentally unfair, *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997), and must establish that prejudice arising from the failure to grant a severance was so "clear, manifest, and undue" that he was denied a fair trial.  *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir. 1996)).  On habeas review, federal courts neither depend on the state law governing severance, *Grisby*, 130 F.3d at 370 (citing *Hollins v. Dep't of Corrections, State of Iowa*, 969 F.2d 606, 608 (8th Cir. 1992)), nor consider procedural rights to a severance afforded to criminal defendants in the federal criminal justice system.  *Id.*  Rather, the relevant question is whether the state proceedings satisfied due process.  *Id.*; *see also Cooper v. McGrath*, 314 F. Supp. 2d 967, 983 (N.D. Cal. 2004).

### b. <u>Right to Confrontation</u>

The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  "The 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'"  *Fenenbock v. Director of Corrections for California*, 692 F.3d 910, 919 (9th Cir. 2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)).  The Confrontation Clause applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 406 (1965).

/////

In 2004, the United States Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial" in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable.  *Crawford v. Washington*, 541 U.S. 36 (2004).  The *Crawford* rule applies only to hearsay statements that are "testimonial" and does not bar the admission of non-testimonial hearsay statements.  *Id.* at 42, 51, 68.  *See also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement.")  Although the *Crawford* court declined to provide a comprehensive definition of the term "testimonial," it stated that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard."  *Crawford*, 541 U.S. at 52.

In *Bruton v. United States*, 391 U.S. 123 (1968), the United States Supreme Court held that a defendant is deprived of his Sixth Amendment right of confrontation when a facially incriminating confession of a non-testifying co-defendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the co-defendant.  391 U.S. at 135.  "Under *Bruton* and its progeny 'the admission of a statement made by a non-testifying codefendant violates the Confrontation Clause when that statement facially, expressly, or powerfully implicates the defendant.'"  *United States v. Hernandez-Orellana*, 539 F.3d 994, 1001 (9th Cir. 2008) (quoting *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007)).  *Bruton* presented a "context[ ] in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."  *Id.* at 135.

*Gray v. Maryland*, 523 U.S. 185 (1998), extended *Bruton* to a codefendant's confession, under similar joint-trial circumstances, that was "redacted . . . by substituting for the defendant's name in the confession a blank space or the word 'deleted.'"  *Gray*, 523 U.S. at 188.  The Supreme Court held that these redactions made no constitutional difference.  *Id.*  However, in *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court held that the admission of a nontestifying codefendant's confession did not violate the defendant's rights under the

40

1   Confrontation Clause where the trial court instructed the jury not to use the confession in any way

2   against the defendant, and the confession was redacted to eliminate not only the defendant's

3   name, but any reference to her existence.

4         Confrontation Clause violations are subject to harmless error analysis. *Whelchel v.*

5   *Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000). "In the context of habeas petitions, the

6   standard of review is whether a given error 'had substantial and injurious effect or influence in

7   determining the jury's verdict.'" *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (quoting

8   *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Factors to be considered when assessing the

9   harmlessness of a Confrontation Clause violation include the importance of the testimony,

10  whether the testimony was cumulative, the presence or absence of evidence corroborating or

11  contradicting the testimony, the extent of cross-examination permitted, and the overall strength of

12  the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).[4]

13        **3. <u>Analysis</u>**

14        Petitioner first argues that the trial court's admission into evidence of his redacted

15  statements to police violated his rights under the Confrontation Clause because the redacted

16  portions included exculpatory statements regarding the victim's willingness to get into his car and

17  smoke marijuana with him and his co-defendants. Assuming *arguendo* that the trial court erred in

18  admitting these redacted statements instead of admitting petitioner's full police interview, any

19  error is harmless. As explained by the California Court of Appeal, petitioner's explanation to

20  police that the victim willingly entered his car and agreed to smoke marijuana with him came

21  before the jury through other parts of petitioner's police interview that *were* admitted into

22  evidence. Specifically, the jury was informed that petitioner told the police that S.L. "first said

23  she wanted to go home but then changed her mind and said she wanted to cruise," that S.L.

24  stopped giving directions to her house after she had been in the car for awhile, and that S.L. was

25  "asking for the weed." *Sanchez*, 2011 WL 3806264, at *17.[5] These admitted portions of

26  ───────────────

27        [4] Although *Van Arsdall* involved a direct appeal and not a habeas action, "there is nothing in the opinion or logic of *Van Arsdall* that limits the use of these factors to direct review." *Whelchel*, 232 F.3d at 1206.

28

1   petitioner's police interview also made clear to the jury that petitioner provided an explanation to

2   the police as to why S.L. entered his vehicle and drove into the country with him and his co-

3   defendants, and that he wasn't merely "evasive when given an opportunity to explain."  ECF No.

4   23 at 22.  Under these circumstances, the trial court's error, if any, in excluding the exculpatory

5   portions of petitioner's police interview could not have had a substantial and injurious effect on

6   the verdict.

7          Petitioner also claims that the trial court violated his rights under the Confrontation Clause

8   by admitting into evidence Edgar Radillo's statements to police, wherein he referred to the people

9   in the car as "we."  Petitioner argues that it was clear to the jury that the pronoun "we" included

10   himself and Alberto.  As set forth above, the California Court of Appeal, in a thorough analysis,

11   concluded that the admission of Radillo's statements did not violate the Confrontation Clause

12   because the statements implicated petitioner only when coupled with other evidence outside of

13   those statements.  The state court concluded that the word "we" could have been interpreted by

14   the jury to refer to Radillo, S.L., and Antonio, who the jurors were already aware were in the car.

15   The conclusion of the Court of Appeal in this regard is a reasonable interpretation of the facts of

16   this case and is not contrary to or an unreasonable application of the holdings in *Bruton*,

17   *Richardson*, and *Gray*.  Further, unlike the situation in *Gray*, Radillo's statements were not

18   altered by the trial court to insert a pronoun for petitioner's name.  Rather, Radillo's statements

19   were introduced as he spoke them, with any reference to petitioner being supplied by other

20   evidence outside of those statements.  The decision of the California Court of Appeal that, under

21   these circumstances, the admission of Radillo's statements did not violate petitioner's rights

22   under the Confrontation Clause is not unreasonable and is certainly not "so lacking in justification

23   that there was an error well understood and comprehended in existing law beyond any possibility

24   /////

25   /////

26   _____

27          [5] In addition, Antonio testified that while they were in the car, S.L. asked whether the
     defendants had any marijuana and they gave her some.  RT at 283-84.  He also testified he told
     the police that when S.L. was in the car she asked whether they had "some weed."  *Id.* at 444.

28

42

for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.  Accordingly, petitioner is not

entitled to habeas relief on this claim.[6]

There was no Confrontation Clause error at petitioner's trial, and accordingly, the trial

court did not violate petitioner's federal constitutional rights in denying his motion to sever his

trial from that of his co-defendants.  Further, the joint trial was not "so prejudicial that it denied a

petitioner his right to a fair trial.  *Zafiro*, 506 U.S. at 538-39.  Accordingly, petitioner is not

entitled to relief on his severance claim.

### D.  Jury Instruction on Rape and Rape in Concert

Petitioner next claims that the jury instructions on rape and rape in concert improperly

directed a verdict against him, in violation of his Sixth Amendment right to a jury trial and his

Fourteenth Amendment right to due process.  ECF No. 23 at 24-25.  Specifically, he claims that

the express language of these instructions essentially informed the jury that he raped the victim in

concert with his co-defendants.  *Id.*

#### 1.  <u>State Court Decision</u>

The California Court of Appeal denied this claim, reasoning as follows:

**Rape and Rape in Concert Instructions**

The jury was instructed on the rape counts as follows:

"The defendants, Israel Sanchez, Alberto Sanchez and Edgar
Radillo, are charged in Counts 2 and 4 with rape by force, a

---

[6] Because the trial court did not commit error under *Bruton* in admitting the statements of Edgar Radillo, there is no *Crawford* error.  *See, e.g., United States v. Rakow*, 286 F. App'x 452, 454 (9th Cir. 2008) (court denies *Crawford* violation where prior testimony of co-defendant was admitted against co-defendant, because ". . . absent *Bruton* error, *Crawford* has no work to do in this context . . . .") (citing *United States v. Johnson*, 297 F.3d 854, 856 n. 4 (9th Cir. 2002); *United States v. Chen*, 393 F.3d 139, 150 (2d Cir. 2004) (the same factual circumstances surrounding admission of co-defendant's statement "that prevent *Bruton* error also serves to prevent *Crawford* error."); *United States v. Gould*, No. CR 03–2274 JB, 2007 WL 1302593, at *3 (D.N.M. Mar. 23, 2007) ("If a limiting instruction is given to the jury, a properly redacted statement of a co-defendant, one that satisfies *Bruton* . . . , does not raise a Confrontation Clause issue pursuant to *Crawford* . . ., because such a statement is not offered against the defendant."); *Bolus v. Portuondo*, No. 9:01–CV–1189, 2007 WL 2846912, at *21 (N.D.N.Y. Sept. 26, 2007) ("Since this court finds no *Bruton* error, there would be no *Crawford* error, even if *Crawford* were applicable.").

violation of Penal Code Section 261(a)(2).  *Count 2 refers to the rape committed by Israel Sanchez.*

"It is alleged that Edgar Radillo and Alberto Sanchez aided and abetted *the rape committed by Israel Sanchez.*

"Count 4 refers to *the rape committed by Edgar Radillo.*  It is alleged that Israel Sanchez and Alberto Sanchez aided and abetted *the rape committed by Edgar Radillo*."  (Italics added.)

Defendants assert the foregoing instruction was tantamount to a directed verdict on counts 2 and 4, inasmuch as the trial court repeatedly referred to rapes committed by either Israel or Edgar as if that was a foregone conclusion.  However, while we agree it would have been better for the trial court to say rapes allegedly committed by Israel and Edgar, the references were meant solely to alert the jury that count 2 refers to the rape allegedly committed by Israel and count 4 refers to the rape allegedly committed by Edgar.

As noted earlier, instructions should be considered as a whole.  (*People v. Espinoza, supra,* 3 Cal.4th at pp. 823–824.)   The remainder of the foregoing instruction read:

"To prove that Israel Sanchez is guilty of rape in Count 1 [sic], the People must prove that, one, the defendant had sexual intercourse with a woman; two, he and the woman were not married to each other at the time of intercourse; three, the woman did not consent to the intercourse; and, four, the defendant accomplished the intercourse by force, violence, menace or fear of immediate and unlawful bodily injury to the woman.

"To prove that Edgar Radillo and Alberto Sanchez are guilty of rape charged in Count 2, refer to the separate instructions on aiding and abetting, CALCRIM 400 and 401.

"To prove that Edgar Radillo is guilty of rape in Count 4, the defendant [sic] must prove, one, the defendant had sexual intercourse with a woman; two, he and the woman were not married to each other at the time of intercourse; three, the woman did not consent to the intercourse; and, four, the defendant accomplished the intercourse by force, violence, menace or fear of immediate, unlawful bodily injury to the woman.

"To prove that Israel Sanchez and Alberto Sanchez are guilty of rape charged in Count 4, please refer to the separate instruction on aiding and abetting found in CALCRIM 400, 401.

"Sexual intercourse means any penetration no matter how slight of the vagina or genitalia by the penis.  Ejaculation is not required.

"To consent, a woman must act freely and voluntarily and know the nature of the act.

"Intercourse is accomplished by force if the person uses enough physical force to overcome the woman's will.

44

"Menace means a threat, statement or act showing an intent to injure someone.

"Intercourse is accomplished by fear if the woman actually and reasonably is afraid or she has actually been unreasonably afraid, and the defendant knows of her fear and takes advantage of it."

The jury was also instructed that the People have the burden of proving lack of consent.

Viewed as a whole, it cannot reasonably be argued the instructions directed a verdict on the two rape counts.  The jury was clearly instructed as to the elements of the offense and that the People had the burden of proving each element.

Defendants also take issue with the trial court's rape in concert instructions for the same reason.  Those instructions read:

"The defendants, Israel Sanchez, Edgar Radillo and Alberto Sanchez, are charged in Counts 3 and 5 with committing rape by acting in concert with each other in violation of Penal Code Section 264.1.

"To prove that a defendant is guilty of this crime, the People must prove, that, one, Israel Sanchez personally committed forceable [sic] rape and voluntarily acted with someone else who aided and abetted its commission; two, Edgar Radillo personally committed forceable [sic] rape and voluntarily acted with someone who aided and abetted its commission.  Alberto Sanchez voluntarily aided and abetted someone else who personally committed forceable [sic] rape.

"Count 3 refers to rape by Israel Sanchez and the aiding and abetting by Edgar Radillo and Alberto Sanchez.

"Count 5 refers to rape by Edgar Radillo and aiding and abetting by Israel Sanchez and Alberto Sanchez.

"To decide whether the defendants, Israel Sanchez and Edgar Radillo, committed rape, please refer to separate instructions that I've given you on that crime.

"To decide whether Alberto Sanchez aided and abetted rape, please refer to the separate instructions that I've given you on aiding and abetting.

"You must apply those instructions when you decide whether the People have proved rape in concert.

"To prove the crime of rape in concert, the People do not have to prove a prearranged plan or scheme to commit rape.  The defendant is not guilty of rape if he actually and reasonably believed that a person consented to the intercourse.

45

"The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented.  If the People have not met this burden, you must find the defendant not guilty."

Read as a whole, the foregoing instruction did not direct a verdict against any of the defendants on the two rape in concert charges.

*Sanchez*, 2011 WL 3806264, at **30-32.

## 2.  **Applicable Legal Standards**

In general, a challenge to jury instructions does not state a federal constitutional claim. *McGuire*, 502 U.S. at 72; *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."  *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).  To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'"  *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'"  *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).

## 3.  **Analysis**

For the reasons expressed by the California Court of Appeal, petitioner has failed to demonstrate that the jury instructions on rape and rape in concert rendered his trial fundamentally unfair.  Although the language of the challenged instructions referred to "the rape committed by" petitioner or Edgar Radillo, the jury instructions, when read as a whole, instructed the jury that it must determine, based on all of the trial evidence, whether the prosecutor had proven these charges beyond a reasonable doubt.  The jurors were specifically advised that if the prosecutor failed to meet his burden of proof, they must find the defendants not guilty.  This instruction belies any argument that the trial court directed a verdict on the rape and rape in concert charges.

/////

46

1    Under the circumstances presented here, the challenged jury instructions did not violate

2    petitioner's right to due process.  Accordingly, petitioner is not entitled to relief on this claim.

3          **E.  Ineffective Assistance of Counsel**

4        Petitioner claims that his trial counsel rendered ineffective assistance in: (1) failing to

5    cross-examine "all witnesses against him;" (2) failing to cross-examine Antonio Sanchez, who

6    falsely testified after entering into a plea agreement that the victim was moved from the car

7    before being assaulted; (3) failing to obtain Antonio Sanchez's "Rap-Sheet;" (4) failing to obtain

8    the "Rap-Sheet" of the victim because she "is a Heavy drinker and uses drugs;" (5) failing to

9    "stop the trial" after the prosecutor's struck "all 'Five' of the First Hispanic's [sic] from the jury

10    Panel;" (6) failing to request a unanimity instruction instructing the jurors that they must agree on

11    exactly which act constituted the kidnapping; (7) failing to request a jury instruction highlighting

12    the victim's testimony that she was pushed to the ground immediately after exiting the car; and

13    (8) repeatedly failing to object to "erroneous jury instructions."  ECF No. 23 at 25-29; ECF No.

14    37 at 15-16.  Petitioner argues that Antonio Sanchez's testimony was not credible because he

15    testified that "Petitioner and co-defendants moved [the victim] (4) four times . . . 16 1/2 feet, then

16    two feet, fifteen feet, than he said twenty feet from the car . . . Then he said that "<u>he actually did</u>

17    <u>not recall the distance</u>."  ECF No. 37 at 15.  He contends that his trial counsel should have filed a

18    motion to "throw out" Antonio Sanchez's "false testimony" in this regard.  *Id.*

19        Petitioner also claims that his trial counsel committed "cumulative errors," such as:  (1)

20    failing to "investigate and prepare adequately before trial;" (2) failing to adequately consult with

21    petitioner about the trial; (3) failing to investigate petitioner's "mental and emotional status while

22    under the influence of drugs Marijuana;" (4) failing to challenge the admissibility of the

23    statements made by Antonio Sanchez; (5) failing to conduct a "proper jury voir dire;" (6) failing

24    to object to "the erroneous jury instruction about Kidnapping element and 'Asportation-by-

25    Fraud;" (7) failing to preserve "meritorious" claims for appeal; (8) failing to file a motion to

26    "suppress" the testimony of Antonio Sanchez; (9) failing to call witnesses on petitioner's behalf;

27    and (10) failing to "make closing arguments at the Sentencing Phase of the trial Proceedings."

28    ECF No. 23 at 28-29.

1    Petitioner's claims of ineffective assistance of counsel were raised for the first time in his

2    petition for a writ of habeas corpus filed in the California Supreme Court.  As explained above,

3    the Supreme Court denied this petition with citations to *In re Waltreus*, 62 Cal.2d 218, 225 (1965)

4    ("habeas corpus ordinarily cannot serve as a second appeal"), *People v. Duvall*, 9 Cal.4th 464,

5    474 (1995) (conclusory allegations made without an explanation of the basis for the allegations or

6    reasonably available documentary evidence do not warrant habeas relief); and *In re Lindley*, 29

7    Cal.2d 709, 723 (1947) (a claim of insufficiency of the evidence can only be considered on direct

8    appeal).  Assuming arguendo that the Supreme Court's ruling constitutes a ruling on the merits of

9    petitioner's claims of ineffective assistance of counsel, the claims should be denied.

10    The clearly established federal law for ineffective assistance of counsel claims is

11    *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed on a *Strickland* claim, a defendant

12    must show that (1) his counsel's performance was deficient and that (2) the "deficient

13    performance prejudiced the defense." *Id.* at 687.  Counsel is constitutionally deficient if his or

14    her representation "fell below an objective standard of reasonableness" such that it was outside

15    "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal

16    quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a

17    fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88 (quoting *Strickland*, 466

18    U.S. at 687).

19    Prejudice is found where "there is a reasonable probability that, but for counsel's

20    unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

21    U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

22    outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable."

23    *Richter*, 131 S.Ct. at 792.  Under AEDPA, "[t]he pivotal question is whether the state court's

24    application of the *Strickland* standard was unreasonable." *Id.* at 785.  "[B]ecause the *Strickland*

25    standard is a general standard, a state court has even more latitude to reasonably determine that a

26    defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

27    Petitioner's claims regarding the alleged failures of his trial counsel should be rejected as

28    unduly vague and conclusory.  Petitioner claims in a conclusory fashion that his trial counsel

48

1    improperly failed to cross-examine "all witnesses against him," failed to "stop the trial" after the

2    prosecutor struck five potential jurors from the jury panel, failed to object to "erroneous jury

3    instructions," failed to "investigate and prepare adequately before trial," failed to adequately

4    consult with petitioner about the trial, fail to challenge the admissibility of the statements made

5    by Antonio Sanchez, failed to conduct a "proper jury voir dire," failed to preserve "meritorious"

6    claims for appeal, failed to call witnesses on petitioner's behalf, and failed to "make closing

7    arguments at the Sentencing Phase of the trial Proceedings." "'Conclusory allegations which are

8    not supported by a statement of specific facts do not warrant habeas relief.'" *Jones v. Gomez*, 66

9    F.3d 199, 204 (9th Cir. 1995) (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)).  In light of

10   the vague nature of these claims, this court is unable to address them in a thorough manner.

11   Petitioner has also failed to demonstrate prejudice, in particular with respect to his claims

12   that his trial counsel rendered ineffective assistance in failing to cross-examine Antonio Sanchez,

13   failing to obtain the "rap sheet" of Antonio Sanchez and the victim, failing to request a unanimity

14   instruction instructing the jurors that they must agree on exactly which act constituted the

15   kidnapping, failing to request a jury instruction highlighting the victim's testimony that she was

16   pushed to the ground immediately after exiting the car, failing to investigate petitioner's "mental

17   and emotional status while under the influence of drugs Marijuana," failing to challenge the

18   admissibility of the statements made by Antonio Sanchez, and failing to file a motion to

19   "suppress" the testimony of Antonio Sanchez.  Petitioner has failed to explain, and the court does

20   not find, that the result of the trial proceedings would have been different had petitioner's trial

21   counsel performed the actions suggested above.  More specifically, there is no evidence before

22   the court that Antonio Sanchez would have changed his testimony if he was cross-examined more

23   thoroughly or pinned down on the exact distance the victim was moved from the car; that the "rap

24   sheet" of Antonio Sanchez or the victim would have provided significant impeachment evidence;

25   that a "unanimity instruction" was available under state law or would have resulted in a different

26   verdict; that the trial court would have allowed a jury instruction highlighting the victim's

27   testimony that she was pushed to the ground immediately after exiting the car; or that petitioner's

28   /////

49

mental abilities were impaired by the use of marijuana.  Mere speculation and unsupported

allegations regarding these issues is insufficient to establish prejudice.

Because petitioner has failed to show that his trial counsel's performance was deficient, or

that any deficient performance resulted in prejudice, he is not entitled to federal habeas relief on

his claims of ineffective assistance of counsel.

### F.  Cumulative Error

In his final ground for relief, petitioner claims that the cumulative effect of the errors

complained of above violated his right to due process and a fair trial.  ECF No. 23 at 31.  He

argues:

> The trial Court's refusal of Petitioner's requested pinpoint instruction informing the jury that "Asportation by Fraud alone" is insufficient to support a Kidnapping, the *refusal* of a Unanimity Instruction on the Kidnapping charge and the admission at a joint trial of a statement by Petitioner from which his explanation of the asportation had been redacted together with the submission to the jury of a legally insufficient Kidnapping theory effectively 'Precluded" a meaningful defense which would otherwise have been available.  Collectively, and in light of the Constitutionally infirm Voir Dire and the Instructions which directed Verdicts on the rape charges, the Erroneous rulings undermined any confidence in the jury's Verdicts and denied Petitioner Due Process and a Fair Trial.

*Id.*

The California Court of Appeal rejected these arguments, reasoning as follows:

> **Cumulative Error**
>
> Defendants contend the cumulative effect of errors found to be harmless on an individual basis requires reversal of the convictions. However, having found no errors that we determined to be harmless on an individual basis, we have no occasion to consider this contention.

*Sanchez*, 2011 WL 3806264, at *33.

The cumulative error doctrine in habeas recognizes that, "even if no single error were

prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless

be so prejudicial as to require reversal.'" *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002)

(quoting *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996)).  However, where there is no

1    single constitutional error existing, nothing can accumulate to the level of a constitutional

2    violation.  *See Fairbank v. Ayers*, 650 F.3d 1243, 1257 (9th Cir. 2011), *cert. denied*, —— U.S. —,

3    132 S.Ct. 1757 (2012) ("[B]ecause we hold that none of Fairbank's claims rise to the level of

4    constitutional error, 'there is nothing to accumulate to a level of a constitutional violation.'")

5    (citation omitted); *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir.2011) ("Because we conclude that

6    no error of constitutional magnitude occurred, no cumulative prejudice is possible.").  "The

7    fundamental question in determining whether the combined effect of trial errors violated a

8    defendant's due process rights is whether the errors rendered the criminal defense 'far less

9    persuasive,' *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and thereby had a 'substantial

10   and injurious effect or influence' on the jury's verdict."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th

11   Cir. 2007) (quoting *Brecht*, 507 U.S. at 637).

12        This court has addressed petitioner's claims of error and has concluded that no error of

13   constitutional magnitude occurred.  There is also no evidence that an accumulation of errors

14   rendered petitioner's trial fundamentally unfair.  Accordingly, petitioner is not entitled to relief on

15   his claim that cumulative error violated his right to due process.

16   **IV. Conclusion**

17        For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

18   application for a writ of habeas corpus be denied.

19        These findings and recommendations are submitted to the United States District Judge

20   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

21   after being served with these findings and recommendations, any party may file written

22   objections with the court and serve a copy on all parties.  Such a document should be captioned

23   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24   shall be served and filed within fourteen days after service of the objections.  Failure to file

25   objections within the specified time may waive the right to appeal the District Court's order.

26   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

27   1991).  In his objections petitioner may address whether a certificate of appealability should issue

28   in the event he files an appeal of the judgment in this case.  *See* Rule 11, *Rules Governing Section*

*2254 Cases* (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  May 21, 2015.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE